# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LARRY WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 21 C 396 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| BOARD OF EDUCATION FOR THE CITY | ) | |
| OF CHICAGO, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Plaintiff Larry Washington, Jr. worked as a Chicago Public School ("CPS") substitute teacher and the girls' varsity basketball coach at Lincoln Park High School ("LPHS") for over twenty years. In January 2020, CPS suspended him in response to a pending CPS Office of the Inspector General (the "OIG") investigation into a text message Washington sent to a member of the girls' basketball team. Although CPS later reinstated him as a substitute teacher, Washington remains barred from teaching or coaching at LPHS. As a result, he brings this suit against the Board of Education for the City of Chicago (the "Board") and the following CPS employees in their official and individual capacities: Jadine Chou, Chief of Safety and Security; Bogdana Chkoumbova, Chief Schools Officer; Dr. Janice Jackson, Chief Executive Officer at the time; Matthew Lyons, Chief Talent Officer;[1] Laura LeMone, District 14 Network Chief; Latanya McDade, Chief Education Officer; Michael Passman, Chief Communications Officer; Debra

---

[1] Washington incorrectly identified Lyons as the CPS Chief Executive Officer in the case caption of his amended complaint. Lyons' correct title is Chief Talent Officer of CPS.

Spraggins, Director of Investigations at the Office of Student Protections; and Jane and John Doe, CPS employees (collectively "Individual Defendants").[2]

Washington alleges that the Board violated Title IX and that the Individual Defendants violated Title IX and the Fourteenth Amendment by removing him from his LPHS positions because he is a man. Washington also brings three state law claims: defamation *per se* against the Individual Defendants, false light against the Defendants, and intentional infliction of emotional distress against the Defendants. Defendants now move to dismiss Washington's federal claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and ask the Court to decline to exercise supplemental jurisdiction over his state law claims. Because Title VII preempts Washington's Title IX claims, the Court dismisses them without prejudice. And because Washington fails to sufficiently allege that Chou, Chkoumbova, Dr. Jackson, LeMone, Passman, Spraggins, and Jane and John Doe were personally involved in the alleged equal protection violation, the Court dismisses without prejudice Washington's remaining federal claims against these officials. However, because Washington sufficiently alleges that Lyons and McDade committed equal protection violations, the Court will not dismiss Washington's equal protection claims against these officials as barred by qualified immunity.

---

[2] Washington sues the Individual Defendants in their official and individual capacities. Defendants argue that his claims against the Individual Defendants in their official capacities are redundant of his claims against the Board. In response, Washington agrees to proceed against the Individual Defendants solely in their individual capacities and therefore, the Court dismisses any claims against the Individual Defendants in their official capacities without prejudice. *See Tom Beu Xiong v. Fischer*, 787 F.3d 389, 398 (7th Cir. 2015) ("Official capacity suits 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (citation omitted)); *Astalus v. Vill. of Morton Grove*, No. 20-CV-4907, 2021 WL 723975, at *1 n.1 (N.D. Ill. Feb. 24, 2021) (dismissing claims against defendant in her official capacity where plaintiff also sued corresponding government entity).

## BACKGROUND[3]

As he had done for many years prior, Washington coached the LPHS girls' varsity basketball team in the 2019 summer league. A student ("STUDENT"), who is the daughter of a high-ranking CPS official ("OFFICIAL 1"), joined the team that summer. Washington once or twice gave STUDENT a ride to a game that summer when requested, as he customarily did for any player who needed or requested a ride. He also occasionally communicated with players, including STUDENT, via text message regarding games, car-pooling, or scheduling; however, the players initiated most of these messages. In September 2019, the LPHS Principal, John Thuet, informed the LPHS coaches, including Washington, that "texting was either no longer allowed or was not condoned." Doc. 5 at 21. "[D]uring the 2019-2020 school year, other coaches at LPHS – and hundreds of coaches at other CPS schools – still communicated with their players by text, as Washington occasionally did, yet none was removed without warning, notice, or discussion." *Id.*

Between July 2019 and January 2020, Washington communicated with STUDENT via text message approximately twenty times solely regarding matters related to the basketball team ("e.g., signing up for the team, obtaining a uniform, asking for a ride to a midseason game, etc."). *Id.* at 4. For example, on July 9, 2019, STUDENT texted Washington asking, "Do you think you could pick me up from the school and drop me off after the game?" and Washington replied, "Yes[,] I pick you up at seven." *Id.* at 49. Similarly, on December 22, 2019, STUDENT texted Washington, "What time do we need to be at the school tomorrow," and Washington responded, "Nine 915." *Id.* at 58. On January 17, 2020, the Friday before the Martin Luther King Jr. holiday, Washington cancelled practice because of an incoming snowstorm. At 12:51

---

[3] The Court takes the facts in the background section from Washington's amended complaint and the exhibits attached thereto and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013).

p.m., he sent a message to the team stating, "I've got some really bad news ladies . . . . I am cancelling practice today. the good news is practice will resume tomorrow at 8:00 a.m." *Id.* at 17. Nine minutes later, Washington texted STUDENT stating, "I heard you were crying that practice got canceled.... so I am going to come up with a individual practice for you [thumbs up emoji] don't worry kid I got you [winking emoji]." *Id.* at 61. STUDENT replied, "Coach I wasn't crying [crying emoji] [crying emoji];" Washington responded, "Are you sure?" to which STUDENT did not reply. *Id.*

At the beginning of the 2019–2020 season, STUDENT was a starter on the girls' varsity basketball team but in January 2020, her performance faltered. Throughout his coaching career, when players had performance issues, "Washington would often develop individual work out plans for them to do on their own (perhaps with a parent) over weekends or holiday breaks to help them get better. These workouts were essentially written drills he gave the players to do." *Id.* at 18. Washington did not intend for the players to perform these drills with him, and he never conducted individual or private coaching sessions. Washington had recently prepared such individual plans for two other players on the team and when he texted STUDENT on January 17, his intent was to similarly develop an individual workout plan for her to do over the holiday weekend because he had cancelled practice. However, Washington did not see STUDENT the rest of the day, so he was not able to provide her with a drill program.

That same day, OFFICIAL 1 submitted a complaint to the Inspector General of the OIG and in response, the OIG initiated an investigation. The OIG Case Initiation Report stated that "Washington was alleged to have 'texted a student that he could set up a 'one on one' basketball practice with them.'" *Id.* at 32. At 11:13 p.m. that night, OFFICIAL 1 exchanged emails with the OIG's Chief Investigator, Amber Nesbitt, in which Nesbitt said, "[W]e'll be in touch with

next steps. We'll discuss amongst ourselves, but I think we should go to Matt [Lyons] or LaTonya [McDade] if we wanted to initiate a pull-out discussion." *Id.* at 31. Normally, the OIG does not include the complainant in its internal processes and considerations. Over the next week, the OIG investigated the complaint and communicated regularly with OFFICIAL 1 and the Board.

A week later, on January 24, Nesbitt emailed Lyons and McDade stating, "We have an unusual block recommendation that I believe will require Matt [Lyons] and/or Latonya [McDade]'s approval." *Id.* at 33. Nesbitt said that Washington offered STUDENT a "private practice" and "waited outside of practice seemingly for STUDENT to come outside." *Id.* Nesbitt continued, "We've been reviewing Washington's emails and Remind messages (nothing concerning found yet) and our cell phone subpoena is still pending." *Id.* In response, "Lyons and McDade agreed to terminate Washington as a coach and suspend (or 'block') him as a teacher, which all Defendants either participated in, knew of, approved of, or thereafter condoned and validated." *Id.*

At the team's practice that evening, Principal Thuet called Washington into his office and "told him he was fired for texting a player." *Id.* at 20. The next day, at Defendants' instruction, Principal Thuet sent a letter to the team's players and parents stating, "There has been an allegation that one of our coaches engaged inappropriately with a student. This employee has been removed from the school, and an investigation has been initiated by the Office of the Inspector General." *Id.* at 22. Earlier that month, CPS suspended the LPHS boys' varsity basketball coach and a week after CPS suspended Washington, it suspended the interim boys' basketball coach and a dean and terminated Principal Thuet and the assistant principal. In response to these six terminations and suspensions, on Friday, January 31, LeMone sent the

LPHS school community an email stating, "I would like to invite you to a meeting with parents and families on Monday, February 3 at 6 p.m. to discuss the school leadership change and transition plans." *Id.* at 23. That night, all local television networks reported the story live from LPHS. Over the weekend, multiple print and broadcast reports detailed the allegations and named Washington.

Multiple press outlets attended the February 3 meeting at LPHS, which LeMone, Chou, Spraggins, and Chkoumbova led. At the meeting, a PowerPoint presentation indicated that the OIG received a "new, separate report of alleged sexual misconduct related to the girls' basketball team" and the CPS officials identified Washington by name. *Id.* at 24. LeMone, Chou, Spraggins, and Chkoumbova "falsely stated and inferred that Washington either committed, or was alleged to have committed, 'adult on student sexual misconduct,' as coach of the girls' basketball team." *Id.* at 5. That night, the *Chicago Sun Times* reported that at the meeting, Chkoumbova said "students had been harmed 'physically' and 'emotionally'" and Spraggins said "[t]here are allegations of both adult-on-student sexual misconduct as well as student on student." *Id.*

On March 26, Nesbitt emailed McDade and other top CPS officials stating, "We completed our investigation on Larry Washington and we are in the process of writing the report. . . . Based on our investigation, we think we might want to consider a reinstatement." *Id.* at 33–34. On May 27, the OIG issued its report to the Board and Dr. Jackson, which stated that "there is no evidence that Washington engaged in any sexual misconduct," the text messages between Washington and STUDENT were "sporadic," and there was "no suggestion that any of these texts related to anything other than basketball and logistics surrounding the team and games." *Id.* at 29–30. However, CPS did not reinstate Washington until June 22 when the

Board's Law Department sent him a letter stating, "As a result of the investigation, you will be allowed to continue substitute teaching for Chicago Public Schools in the future." *Id.* at 113. However, the letter did not mention Washington's coaching position and he remains blocked from teaching or coaching at LPHS. The letter to Washington explained that "the allegations . . . were partially substantiated" because "[t]he investigation found that while [he] communicated with students improperly and gave students rides in [his] vehicle, [his] actions were related to [his] duties as a basketball coach and were not sexually motivated nor retaliatory." *Id.* The Board did not send Washington a copy of the OIG report.

The next day, LeMone sent an email to the LPHS community sharing the disciplinary actions for Washington and the two boys' basketball coaches. The letter stated:

> The Office of Student Protections and Title IX and the Office of Inspector General substantiated multiple allegations of serious misconduct at Lincoln Park High School. Based on these findings, the district has decided to file dismissal charges and move forward with a termination hearing for Pat Gordon (school security officer). In addition, the district has revised its discipline recommendation for Donovan Robinson (community relations representative at another CPS high school) and Larry Washington (day-to-day citywide substitute). While misconduct was substantiated, the district determined that it is appropriate for Mr. Robinson and Mr. Washington to return to their respective instructional positions. To ensure understanding of district policies moving forward, Mr. Robinson and Mr. Washington will receive training and support from the Network and the CPS Office of Student Protections and Title IX.

*Id.* at 115. This letter left readers "with the false impression that Washington was found guilty of serious misconduct when he was actually cleared of any such false charges." *Id.* at 37. Because of the "mass publicity" surrounding Washington's termination from LPHS, his neighbors, community members, and even strangers have ridiculed and shamed him and his family. *Id.* at 39. Defendants' actions have severely damaged Washington's reputation and have caused him

7

to suffer from anxiety and depression. Further, in addition to working at LPHS, Washington used to work as a mental health specialist and supervisor at Hartgrove Hospital in Chicago. In response to Washington's suspension and the surrounding news coverage, Hartgrove Hospital demoted him and prohibited him from interacting with minors, and "[h]is colleagues viewed him with suspicion and disdain." *Id.* at 39. This forced Washington to obtain a new job as a behavioral health technician in Elk Grove Village. He is no longer a supervisor and his commute tripled.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Title IX Claims

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

8

any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).

Washington alleges that Defendants violated Title IX by excluding him from participating in his

LPHS jobs on the basis of his sex because if a woman had sent the same text message, the Board

would not have removed her. Defendants argue that, according to Seventh Circuit precedent,

Title VII preempts Washington's Title IX claims and therefore, the Court must dismiss them.

The Seventh Circuit has held that Title VII preempts other claims for alleged employment

discrimination insofar as Title VII provides the same remedy sought by the plaintiff. *Waid v.

Merrill Area Pub. Schs.*, 91 F.3d 857, 862 (7th Cir. 1996), *abrogated on other grounds by

Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009). The Seventh Circuit reasoned that

"[w]hen Congress creates a comprehensive statutory scheme for protecting a right, it may

impliedly express the intention that this scheme should be exclusive," *id.* at 861, and "Title VII

provides a comprehensive statutory scheme for protecting rights against discrimination in

employment," *id.* at 861–62. Therefore, it held that Title VII preempted a teacher's employment

discrimination claims for equitable relief (the only form of relief available under Title VII at the

time) under Title IX and § 1983. *Id.* at 862. The Seventh Circuit recently reiterated its

"precedent that all employment-discrimination claims must be brought under Title VII." *Brown

v. Ill. Dep't of Hum. Servs.*, 717 F. App'x 623, 625–26 (7th Cir. 2018).

Washington does not dispute that Seventh Circuit precedent preempts his Title IX

employment discrimination claims, which is wise given that he "does not identify any remedy

[he] seeks under Title IX that would be unavailable under Title VII. Under *Waid* then, [he]

cannot bring a Title IX claim." *Agbefe v. Bd. of Educ. of City of Chi.*, No. 19 C 4397, 2021 WL

1885964, at *4 (N.D. Ill. May 11, 2021). Instead, Washington argues that this precedent is no

longer good law because it is contrary to recent analogous Supreme Court and Seventh Circuit

9

decisions. Doc. 39 at 6. Washington points to *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246 (2009), which held that Title IX does not preempt § 1983 equal protection claims for gender discrimination in schools, and *Levin v. Madigan*, 692 F.3d 607 (7th Cir. 2012), which relied on *Fitzgerald*'s reasoning in holding that the Age Discrimination in Employment Act does not preempt separate § 1983 claims. However, this Court must follow the Seventh Circuit's precedent unless it is "almost certain that the higher court would repudiate the doctrine if given the chance to do so." *United States v. Betts*, 509 F. Supp. 3d 1053, 1059 (C.D. Ill. 2020) (citation omitted). Given that the Seventh Circuit reaffirmed its precedent in 2018, after both *Fitzgerald* and *Levin* had been decided, the Court is far from certain that if given the chance, the Seventh Circuit would overturn *Waid*, particularly given that Washington has failed to convince the Court that *Fitzgerald* and *Levin* are irreconcilable with *Waid*.

Washington's Title IX claims are clearly employment discrimination claims. *See* Doc. 5 at 40 ("Washington was terminated from his coaching job and remains blocked from his teaching position at LPHS because he is a man."); *id.* at 42 ("[B]ecause of his gender, Defendants removed Washington from his coaching and teaching jobs at the School."). Therefore, the Court dismisses without prejudice Washington's Title IX claims against Defendants as preempted by Title VII. *See, e.g.*, *Agbefe*, 2021 WL 1885964, at *4 (dismissing "Title IX claims [that] sound[ed] squarely in employment discrimination" as preempted by Title VII); *Bergholz v. John Marshall L. Sch.*, 448 F. Supp. 3d 887, 897 (N.D. Ill. 2020) (granting defendants summary judgment on Title IX sex discrimination claim because Title VII precluded it). *But see Cieslik v. Bd. of Educ. of City of Chi.*, No. 19-CV-05553, 2021 WL 1172575, at *5 (N.D. Ill. Mar. 29, 2021) (finding plaintiff's Title IX retaliation claims not preempted by Title VII because "the

Plaintiffs alleged their opposition to sexual harassment in an educational setting, not in the context of an employer-employee relationship").

## II.       Equal Protection Section 1983 Claim

Defendants next ask the Court to dismiss Washington's § 1983 claim against the Individual Defendants for violating the Equal Protection Clause of the Fourteenth Amendment by terminating him from his LPHS positions because of his gender. "To prevail on a § 1983 claim, the plaintiff must prove that '(1) he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon him by a person or persons acting under color of state law.'" *First Midwest Bank Guardian of Est. of LaPorta v. City of Chi.*, 988 F.3d 978, 986 (7th Cir. 2021) (citation omitted). However, "[f]or constitutional violations under § 1983, 'a government official is only liable for his or her own misconduct.'" *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (citation omitted). Defendants argue that Washington fails to sufficiently allege that each Individual Defendant is personally liable for the violation of Washington's rights and that a violation of his rights occurred at all. Defendants also argue that qualified immunity bars Washington's claims against the Individual Defendants. The Court will address each argument in turn.

### A.       Individual Liability

Defendants argue that Washington has failed to sufficiently allege that each Individual Defendant was personally involved in a violation of his right to equal protection. "Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation." *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (citation omitted). Washington must allege "a causal connection between (1) the sued officials and (2) the alleged misconduct." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017). "Put another

way, personal involvement in the equal protection context requires specific intent to discriminate" by each sued official. *Ways*, 999 F.3d at 494. Therefore, Washington's amended complaint must sufficiently allege that each Individual Defendant "acted on the basis of his [gender]" when removing him from coaching and teaching at LPHS. *Id.* at 495.

### 1. Matthew Lyons and Latanya McDade

Lyons is CPS' Chief Talent Officer and McDade is CPS' Chief Education Officer. Washington alleges that on January 24, 2020, after communicating with the OIG, "Lyons and McDade approved and agreed to terminate Washington as coach and suspend (or 'block') him as a teacher," Doc. 5 at 33; that "on the basis of Washington's sex, CPS, through its agents, the individual Defendants, subjected Washington to discrimination by terminating his coaching and teaching jobs at LPHS," *id.* at 41; and that "[h]ad a female coach sent the identical texts Coach Washington sent, she would not have been removed as coach, let alone accused of committing 'adult on student sexual misconduct,'" *id.* at 41. This sufficiently alleges Lyons' and McDade's personal involvement in removing Washington from LPHS and a causal connection between their actions and Washington's removal. *See Odogba v. Wis. Dep't of Just.*, 22 F. Supp. 3d 895, 912 (N.D. Ill. 2014) (finding allegations sufficient to support § 1983 personal liability where the plaintiff alleged that the defendant knew of plaintiff's discrimination complaint and took retaliatory action against plaintiff as a result). As the Court will discuss in detail below, these allegations also sufficiently plead that Lyons and McDade "acted on the basis of" Washington's gender when removing him from his LPHS positions. *Ways*, 999 F.3d at 495. Therefore, the Court will not dismiss Washington's § 1983 claims against Lyons and McDade for failure to sufficiently allege personal involvement.

##### 2. Jadine Chou, Bogdana Chkoumbova, Laure LeMone, and Debra Spraggins

Chou is the Chief of Safety and Security for CPS, Chkoumbova is the Chief Schools Officer for CPS, LeMone is the Network Chief of District 14 (which includes LPHS), and Spraggins is the Director of Investigations at the Office of Student Protections. The amended complaint alleges that these four officials led the public February 3 meeting regarding, in part, Washington's suspension. Washington alleges that at the meeting, LeMone, Chou, Chkoumbova, and Spraggins "expressly stated or inferred that some of the alleged 'adult on student sexual misconduct' related to the girls' basketball team and was committed by Washington, which is false." Doc. 5 at 25. Washington also alleges that "Chkoumbova said CPS' actions were 'irreversible,' and she defended them by saying: 'If there is no evidence or the investigations are not concluding that this is the next right move, CPS would not have done this.'" *Id.* at 26. In addition to her statements at the meeting, Washington alleges that LeMone sent the LPHS community a misleading letter regarding his reinstatement as a CPS teacher in June 2020. Defendants argue that, at best, these allegations amount to a defamation claim against LeMone, Chou, Chkoumbova, and Spraggins, but not an equal protection claim. The Court agrees. Washington alleges that the Individual Defendants violated the Equal Protection Clause by removing him from his coaching and teaching positions at LPHS. *Id.* at 42. However, the amended complaint merely alleges that Chou, Chkoumbova, LeMone, and Spraggins publicly presented false information regarding Washington *after* CPS had already removed him. Therefore, the Court cannot reasonably infer that Chou, Chkoumbova, LeMone, and Spraggins were personally involved in removing Washington or that a causal connection exists between their alleged actions (that occurred after CPS removed Washington) and CPS removing

13

Washington. *See Colbert*, 851 F.3d at 657 (stating "a causal connection between (1) the sued officials and (2) the alleged misconduct" must exist in a § 1983 claim).

In response, Washington points to general allegations that pertain to all Defendants including: "Defendants took part in, made, and/or approved the decision to terminate Coach Washington as girls' basketball coach," Doc. 5 at 21; "all Defendants either participated in, knew of, approved of, or thereafter condoned and validated" Washington's removal, *id.* at 33; and "[r]egarding the handling of Washington's case, Defendants knew of each other's conduct and actions, consulted with one another, and approved of and condoned each other's actions," *id.* at 38. However, these allegations standing alone cannot support the personal responsibility of each Individual Defendant. *See Rivera v. Town of Cicero*, No. 19 C 3728, 2019 WL 5420154, at *7 (N.D. Ill. Oct. 23, 2019) ("Rivera's sweeping allegations concerning all Defendants are insufficient to allege that the Defendants were personally involved."); *Dawson v. Carter*, No. 15 C 4321, 2016 WL 4151035, at *2 (N.D. Ill. Aug. 5, 2016) ("Plaintiff pleads in conclusory fashion that all 'Defendants' are responsible for the unlawful search, seizure, use of excessive force, false arrest, false imprisonment and failure to intervene. Such generic allegations of personal involvement are insufficient to state Section 1983 claims against the Moving Officers." (citations omitted)). This is particularly so where, as here, plaintiffs specifically identify officials that participated in the alleged wrongful conduct. *See Barnhouse v. City of Muncie*, 499 F. Supp. 3d 578, 589 (S.D. Ind. 2020) (dismissing § 1983 claims against individual officers despite allegations that the "Police Defendants" were collectively responsible for the harm where the plaintiff also specifically alleged that two sergeants "participated in the wrongful conduct"). In other words, this is not a case in which "the plaintiff has been injured as the consequence of the actions of an unknown member of a collective body, [and] identification of the responsible party

14

may be impossible without pretrial discovery." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009) (citation omitted). Instead, Washington specifically alleges that Lyons and McDade wrongfully removed him from his LPHS positions; while, in contrast, he does not include any allegations to suggest that the remaining Individual Defendants had any input into the decision to remove him but does include very specific allegations regarding the actions they took after his removal. Therefore, the Court dismisses Washington's § 1983 claims against Chou, Chkoumbova, LeMone, and Spraggins without prejudice. *See, e.g.*, *Odogba*, 22 F. Supp. at 911 (dismissing § 1983 claims against human resources manager because although he had "personal knowledge of [plaintiff's] complaints," "there is no allegation that [he] was involved in any discriminatory or retaliatory conduct").

### 3. Michael Passman

Passman is the Chief Communications Officer for CPS. The amended complaint merely alleges that a *Chicago Sun Times* article quoted Passman discussing the LPHS suspensions, which is hardly surprising giving his role. Washington incorrectly attributes a statement in the article to Passman, Doc. 5 at 27, but the article in the exhibit attached to the amended complaint attributes that statement generally to "CPS officials," *id.* at 108. Therefore, the Court will not attribute this statement to Passman. *See Centers v. Centennial Mortg., Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (holding that if an exhibit attached to the complaint contradicts the complaint, the exhibit controls). However, even considering that statement, the amended complaint fails to sufficiently allege Passman was personally involved in removing Washington from his LPHS positions. Therefore, the Court will dismiss Washington's § 1983 claims against Passman without prejudice.[4] *See Dawson*, 2016 WL 4151035, at *2 (dismissing § 1983 claims against

---

[4] Washington also named Jane and John Doe, CPS employees, as Defendants. However, Washington only alleges that they "are as-yet-unknown employees of CPS who made defamatory statements regarding

police officers because plaintiff did not allege that the officers "were present at the scene of the traffic stop, or that they engaged in any specific conduct that deprived him of his constitutional rights").

### 4. Dr. Janice Jackson

Dr. Jackson formerly served as the Chief Executive Officer of CPS. As a supervisory official, Dr. Jackson may be personally responsible for a constitutional violation "if the conduct causing the constitutional deprivation occurs at [her] direction or with [ ] her knowledge and consent." *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). Washington's sole allegation with respect to Dr. Jackson is that the OIG issued its final report to her on May 27, 2020, months after Lyons and McDade decided to terminate Washington. He does not specifically allege that she had any participation in or knowledge of the decision to remove Washington, let alone that she directed or consented to the decision. The Court cannot hold Dr. Jackson vicariously liable for her subordinates' unlawful actions, *see Ways*, 999 F.3d at 495 ("[Supervisors] need not have participated directly in the constitutional deprivation, but the allegations must amount to more than vicarious liability for [their subordinates'] unlawful actions."), and therefore, the Court will dismiss the § 1983 claims against her without prejudice, *see Odogba*, 22 F. Supp. 3d at 911 (dismissing § 1983 claims against the top two Department of Justice officials because their knowledge of plaintiff's discrimination complaint "without more, is insufficient to establish personal involvement in the discriminatory or retaliatory conduct").

---

Plaintiff and/or who participated in Plaintiff's wrongful termination as coach and suspension as teacher." Doc. 5 at 8. Because the issues raised in Defendants' motion to dismiss apply equally to Jane and John Doe and Washington had an adequate opportunity to respond, the Court extends consideration of Defendants' arguments to include Jane and John Doe. *See Malak v. Associated Physicians, Inc.*, 784 F.2d 277, 280 (7th Cir. 1986) (court may *sua sponte* enter judgment in favor of additional non-moving defendants if motion by one defendant is equally effective in barring claim against other defendants and plaintiff had adequate opportunity to respond to the motion). Because Washington makes no specific allegations of misconduct with respect to Jane and John Doe, the Court dismisses his § 1983 claims against them without prejudice.

### B.    Sufficiency of Discrimination Allegations

Lyons and McDade next argue that Washington fails to sufficiently allege gender discrimination under the Equal Protection Clause.  To sufficiently allege an equal protection violation based on class membership under § 1983, Washington must allege that "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose."  *Chavez v. Ill. State Police*, 251 F.3d 612, 635–36 (7th Cir. 2001).  In other words, "[f]or an equal-protection claim based on class membership to survive a motion to dismiss, a plaintiff must sufficiently allege that they were treated differently by the government based on membership in a protected class, and that the defendant acted with discriminatory intent."  *Doe v. Bd. of Educ. of City of Chi.*, No. 19 C 00263, 2020 WL 1445638, at *6 (N.D. Ill. Mar. 24, 2020).

### 1.    Materially Adverse Employment Action

Lyons and McDade first assert that "a materially adverse action is fundamental to, and 'built into,' both employment discrimination and retaliation claims" and that Washington's amended complaint fails to allege a sufficient materially adverse employment action.  Doc. 24 at 7–8 (quoting *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 661 (7th Cir. 2005)).  Washington submits that he has sufficiently pleaded a materially adverse employment action by alleging he remains banned from coaching and teaching at LPHS.  However, Washington alleges that the Individual Defendants violated his right to equal protection under the Fourteenth Amendment, not under Title VII.  To sufficiently allege an equal protection claim, Washington must only allege that the Individual Defendants treated him differently based on his membership in a protected class.  *Doe*, 2020 WL 1445638, at *6.  As discussed below, Washington has sufficiently alleged that Lyons and McDade treated him differently based on his gender and that is all that the law requires at the pleading stage.

17

### 2.    Discriminatory Effect

Lyons and McDade next argue that Washington's amended complaint lacks factual allegations to support that their actions had a discriminatory effect.  To prove discriminatory effect, Washington must show that "[1] he is a member of a protected class, [2] that he is otherwise similarly situated to members of the unprotected class, and [3] that he was treated differently from members of the unprotected class."  *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005).  Lyons and McDade assert that Washington fails to allege similarly situated members of the unprotected class.  However, this is an evidentiary standard, not a pleading standard, and thus, Washington need not do so at this time.  *See Freeman v. Metro. Water Reclamation Dist. of Greater Chi.*, 927 F.3d 961, 965 (7th Cir. 2019) ("A plaintiff alleging race discrimination need not allege each evidentiary element of a legal theory to survive a motion to dismiss."); *Taylor v. Nunez*, No. 18 CV 7844, 2019 WL 5393996, at *4 (N.D. Ill. Oct. 22, 2019) ("To be sure, in the discrimination context, failing to identify similarly situated comparators is 'not fatal' to the complaint." (citation omitted)); *Smith v. City of Chi.*, 143 F. Supp. 3d 741, 755 (N.D. Ill. 2015) ("It is well-established, however, that under the federal pleading standards, a plaintiff need not plead a prima facie case because it is an evidentiary standard, not a pleading requirement.").

Washington alleges that "Lyons and McDade agreed to terminate Washington as a coach and suspend (or 'block') him as a teacher," Doc. 5 at 33; "because of his gender, Defendants removed Washington from his coaching and teaching jobs at [LPHS]," *id.* at 42; "[h]ad a female coach sent the identical texts, she would not have been removed as coach, let alone accused of committing 'adult on student sexual misconduct,'" *id.* at 22; and "during the 2019-2020 school year, other coaches at LPHS – and hundreds of coaches at other CPS schools – still communicated with their players by text, as Washington occasionally did, yet none was removed

without warning, notice, or discussion," *id.* at 21. Accepting these allegations as true and drawing all reasonable inferences in Washington's favor, Washington has sufficiently alleged discriminatory effect: he alleges he belongs to a protected class (men) and that Lyons and McDade treated him differently because of his membership in that class. *See, e.g.*, *Freeman*, 927 F.3d at 965 (overturning dismissal of complaint and finding that plaintiff alleging discrimination under § 1983 "needed only to allege—as he did here—that the District fired him because of his race"); *Brown*, 398 F.3d at 916 n.1 ("[T]his court has held that an allegation as simple as 'I was turned down a job because of my race is all a complaint has to say' to plead sufficiently race discrimination in violation of the Equal Protection clause." (citation omitted)).

Moreover, Washington's allegations "inherently implicate[] [his] sex," *Doe*, 2020 WL 1445638, at *7, because he alleges that Lyons and McDade removed him from coaching and teaching at LPHS based on false allegations of sexual misconduct, *see, e.g.*, Doc. 5 at 41 ("Had a female coach sent the identical texts Coach Washington sent, she would not have been removed as coach, let alone accused of committing 'adult on student sexual misconduct.' Had a female coach sent the identical texts Coach Washington sent, the texts would not have been considered as even potentially constituting sexual misconduct."). *Cf. Doe*, 2020 WL 1445638, at *7 (finding plaintiff sufficiently alleged gender discrimination and noting "the fact that Velarde allegedly improperly touched James Doe's *genitals* on multiple occasions inherently implicates James Doe's sex, at least at the pleading stage"). Washington's allegations are adequate to give "fair notice of what the claim is and the grounds upon which it rests," which is all that the pleading standard requires. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 832 (7th Cir. 2015); *see, e.g.*, *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (finding that plaintiff "alleged which positions she sought and was denied, and she

19

attributed the denial to sex discrimination," which "satisf[ied] the [pleading] standard").
Therefore, the Court finds that Washington has sufficiently pleaded that Lyons and McDade's
actions had a discriminatory effect.

### 3. Discriminatory Intent/Purpose

Lyons and McDade further argue that Washington "fail[s] to allege that their decision to
terminate him as a teacher and coach at LPHS was *because of* his gender." Doc. 24 at 11.
"Discriminatory purpose . . . implies more than . . . intent as awareness of consequences. It
implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in
part because of . . . its adverse effects upon an identifiable group." *Chavez*, 251 F.3d at 645
(citation omitted). Washington alleges that "Lyons and McDade approved and agreed to
terminate Washington as coach and suspend (or 'block') him as a teacher," Doc. 5 at 33; that "on
the basis of Washington's sex, CPS, through its agents, the individual Defendants, subjected
Washington to discrimination by terminating his coaching and teaching jobs at LPHS," *id.* at 41;
and "[h]ad a female coach sent the identical texts Coach Washington sent, she would not have
been removed as coach, let alone accused of committing 'adult on student sexual misconduct,'"
*id.*

The Seventh Circuit has emphasized that "[i]t does not take much to allege
discrimination," *Wigginton v. Bank of Am. Corp.*, 770 F.3d 521, 522 (7th Cir. 2014), and that
"[s]pecific facts are not necessary," *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010)
(alteration in original) (citation omitted). *See also Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d
1014, 1028 (7th Cir. 2013) (noting in analogous Title VII discrimination context that "the
complaint merely needs to give the defendant sufficient notice to enable him to begin to
investigate and prepare a defense"). Drawing all inferences in Washington's favor, the Court

finds that his allegations of discriminatory intent suffice at this early stage because it can reasonably infer that Lyons and McDade acted, at least in part, because of Washington's gender. *See Citibank*, 614 F.3d at 405 ("Swanson's complaint identifies the type of discrimination that she thinks occurs (racial), by whom (Citibank, through Skertich, the manager, and the outside appraisers it used), and when (in connection with her effort in early 2009 to obtain a home-equity loan). This is all that she needed to put in the complaint."); *Casimir v. City of Chi.*, No. 15 C 3711, 2018 WL 1695362, at *9 (N.D. Ill. Apr. 6, 2018) ("The questions of which inferences can, or should, be drawn from the statistical evidence and the evidence of plaintiffs' treatment are better suited for summary judgment or a full evidentiary hearing."). Therefore, the Court finds that Washington has sufficiently pleaded that a discriminatory purpose motivated Lyons and McDade's decision to terminate him from his LPHS positions. As a result, Washington has sufficiently alleged Lyons and McDade violated his equal protection rights. *See Chavez*, 251 F.3d at 635–36 (holding that an equal protection violation occurs when "the defendants' actions had a discriminatory effect and were motivated by a discriminatory purpose").

### C. Qualified Immunity

Finally, in the alternative, Lyons and McDade move to dismiss the claims against them as barred by qualified immunity. "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, --- U.S. ----, 137 S. Ct. 548, 551 (2017) (citation omitted) (internal quotation marks omitted). Therefore, to survive Defendants' motion to dismiss, Washington's amended complaint must plausibly allege that Lyons and McDade violated his clearly established rights. *See Hanson v. LeVan*, 967 F.3d 584, 592 (7th Cir. 2020). Washington argues that the amended complaint sufficiently alleges that the Individual Defendants violated

his clearly established right to be free from discrimination based on his gender.  Lyons and

McDade do not dispute that Supreme Court precedent clearly established the right to be free

from arbitrary gender-based discrimination at the relevant time.  *See Nabozny v. Podlesny*, 92

F.3d 446, 455 (7th Cir. 1996) ("The Fourteenth Amendment provides that a State shall not 'deny

to any person within its jurisdiction the equal protection of the laws.'  In 1971, the Supreme

Court interpreted the Equal Protection Clause to prevent arbitrary gender-based discrimination."

(citing *Reed v. Reed*, 404 U.S. 71, 76)).  Instead, they argue that Washington fails to allege that

Lyons and McDade violated that clearly established right.

"Because a qualified immunity defense so closely depends 'on the facts of the case,' a

'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'"

*Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) (citation omitted).  Therefore, "a defendant

asserting qualified immunity at the pleading stage is subject 'to a more challenging standard of

review than would apply on summary judgment,' and 'it is the defendant's conduct as alleged in

the complaint that is scrutinized for objective legal reasonableness.'"  *Thuet v. Chi. Pub. Schs.*,

No. 20 C 1369, 2020 WL 5702195, at *3 (N.D. Ill. Sept. 24, 2020) (quoting *Palmer*, 906 F.3d at

549)).  Because the Court concluded that Washington has sufficiently alleged that Lyons and

McDade violated his equal protection rights, it will not dismiss Washington's § 1983 claims

against Lyons and McDade as barred by qualified immunity at this time.[5]

---

[5] Defendants ask the Court to decline to exercise supplemental jurisdiction over Washington's state law claims if they are the only claims that remain.  *See Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 812 (7th Cir. 2021) ("Without a federal claim in the case, the district court appropriately dismissed Plaintiffs' state law claims without prejudice, thereby relinquishing subject matter jurisdiction over the remaining claims.").  However, because the Court maintains jurisdiction over Washington's § 1983 claims against Lyons and McDade, the Court will maintain its supplemental jurisdiction over Washington's state law claims.

**CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss [24]. The Court dismisses without prejudice Washington's Title IX claim against the Board, his § 1983 claims for Title IX violations against the Individual Defendants, and his § 1983 claims for equal protection violations against Chou, Chkoumbova, Dr. Jackson, LeMone, Passman, Spraggins, and Jane and John Doe. The Court also dismisses Washington's § 1983 claims against Lyons and McDade in their official capacities. Washington's § 1983 claims for equal protection violations against Lyons and McDade in their individual capacities, as well as his state law claims, remain pending before this Court.


Dated: December 8, 2021

SARA L. ELLIS
United States District Judge

23